# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE DZS INC. SECURITIES LITIGATION | § § § | CIVIL NO. 4:23-CV-549-SDJ |
| THIS DOCUMENT RELATES TO: ALL ACTION | § § § § § | MASTER DOCKET |

---

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

---

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ............................................................................................. 2

    A.    Company Background and History........................................................... 2

    B.    DZSI's Fraudulent Accounting................................................................. 4

    C.    Management's Knowledge and Reckless Disregard................................. 5

    D.    The Truth Emerges ................................................................................... 7

LEGAL STANDARD...................................................................................................... 8

ARGUMENT .................................................................................................................... 8

    A.    False Misrepresentations.......................................................................... 9

        1.    Falsity......................................................................................... 9

        2.    Materiality................................................................................. 12

    B.    Scienter ................................................................................................... 13

        1.    Defendants Had Direct Knowledge of and Were Involved in the Fraud.. 14

        2.    The Pattern of Changes in Key Personnel and Auditors Constitutes a Clear Red Flag that Contributes to a Strong Inference of Scienter. ................... 16

        3.    The Magnitude and Materiality of the Restatements and Remedial Measures Contribute to a Strong Inference of Scienter. ........................... 18

        4.    The SOX Certifications Contribute to a Strong Inference of Scienter. .... 19

        5.    Defendants Do Not Provide an Alternative Inference of Nonculpable Conduct. ................................................................................................... 21

CONCLUSION................................................................................................................ 30

## TABLE OF AUTHORITIES

**Cases**

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk,*
   291 F.3d 336 (5th Cir. 2002)................................................................................ 22

*Abrams v. Baker Hughes Inc.,*
   292 F.3d 424 (5th Cir. 2002)........................................................................... 27, 28

*In re AOL Time Warner Sec. & "ERISA" Litig.,*
   381 F. Supp. 2d 192 (S.D.N.Y. 2004)................................................................ 16

*In re ArthroCare Corp. Sec. Litig.,*
   726 F. Supp. 2d 696 (W.D. Tex. 2010)........................................................ passim

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
   324 F.Supp.2d 474 (S.D.N.Y. 2004)............................................................. 11, 13

*In re Avon Sec. Litig.,*
   No. 19 Civ. 01420 (CM), 2019 U.S. Dist. LEXIS 200816 (S.D.N.Y. Nov. 18, 2019)............. 28

*Basic v. Levinson,*
   485 U.S. 224 (1988) ........................................................................................... 12

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................................. 8

*Brown v. Wal-Mart Stores E., L.P.,*
   969 F.3d 571 (5th Cir. 2020).............................................................................. 23

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs.,*
   497 F.3d 546 (5th Cir. 2007)................................................................... 19, 20, 21

*In re Cylink Securities Litigation,*
   178 F. Supp. 2d 1077 (N.D. Cal. 2001) ............................................................. 11

*In re Fleming Cos. Inc. Sec. & Derivative Litig.,*
   No. 5:03-MD-1530, 2004 U.S. Dist. LEXIS 26488 (E.D. Tex. June 10, 2004) ................ passim

*Fresno Cty. Emples. Ret. Ass'n v. comScore, Inc.,*
   268 F. Supp. 3d 526 (S.D.N.Y. 2017)................................................................ 13

*Gamboa v. Citizens, Inc.,*
   No. A-17-CV-241-RP, 2018 U.S. Dist. LEXIS 76457 (W.D. Tex. May 7, 2018) ................ 25

*Gimpel v. Hain Celestial Grp., Inc.,*
   No. 23-7612, 2025 U.S. App. LEXIS 25123 (2d Cir. Sept. 29, 2025) .............................. passim

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.,*
   63 F.4th 747 (9th Cir. 2023)............................................................................... 28

*Goldstein v. MCI WorldCom,*
   340 F.3d 238 (5th Cir. 2003)............................................................................... 27

*Grae v. Corr. Corp. of Am.*,
  No. 3:16-cv-2267, 2017 U.S. Dist. LEXIS 207475 (M.D. Tenn. Dec. 18, 2017).................... 29

*Heck v. Orion Grp. Holdings, Inc.*,
  468 F. Supp. 3d 828 (S.D. Tx. 2020) .................................................................................... 28

*Higginbotham v. Baxter Int'l Inc.*,
  495 F.3d 753 (7th Cir. 2007)................................................................................................ 24

*Kaltman v. Key Energy Services, Inc.*,
  447 F. Supp. 2d 648 (W.D. Tex. 2006)................................................................ 10, 12, 13, 14

*In re Lattice Semiconductor Corp. Sec. Litig.*,
  No. 05-CV-1179-AA, 2006 U.S. Dist. LEXIS 262 (D. Or. Jan. 3, 2006) ............................... 20

*Luczak v. Nat'l Bev. Corp.*,
  812 F. App'x 915 (11th Cir. 2020) ....................................................................................... 23

*In re MicroStrategy, Inc. Secs. Litig.*,
  115 F. Supp. 2d 620 (E.D. Va. 2000)........................................................................ 19, 21, 26

*Nathenson v. Zonagen Inc.*,
  267 F.3d 400 (5th Cir. 2001)................................................................................................ 25

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ............................................................................................ 28

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020)................................................................................................ 23

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Entm't Corp.*,
  58 F.4th 195 (5th Cir. 2023)................................................................................................. 14

*Owens v. Jastrow*,
  789 F.3d 529 (5th Cir. 2015).................................................................................... 14, 21, 25

*In re Pareteum Sec. Litig.*,
  No. 19-CV-9767 (GHW), 2021 U.S. Dist. LEXIS 151106 (S.D.N.Y. Aug. 11, 2021) 17, 18, 20

*Samuels v. Henry*,
  No. 1:23-cv-00132, 2025 U.S. Dist. LEXIS 185526 (N.D. Tex. Sept. 22, 2025).................... 23

*In re Scottish Re Grp. Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007)........................................................................ 17, 18, 20

*SEC v. Hawk*,
  No. 03:05-CV-00172-LRH-VPC, 2007 U.S. Dist. LEXIS 57414 (D. Nev. Aug. 3, 2007)...... 30

*In re Seitel, Inc. Sec. Litig.*,
  447 F. Supp. 2d 693 (S.D. Tex. 2006) ....................................................................... 18, 19, 21

*Sgalambo v. McKenzie*,
  739 F. Supp. 2d 453 (S.D.N.Y. 2010)................................................................................... 30

*Spitzberg v. Houston Am. Energy Corp.*,
  758 F.3d 676 (5th Cir. 2014)................................................................................................ 29

*Stiel v. Heritage Numismatic Auctions, Inc.,*
  816 F. App'x 888 (5th Cir. 2020) ................................................................................... 9

*In re Suprema Specialties, Inc. Sec. Litig.,*
  438 F.3d 256 (3d Cir. 2006) ........................................................................................ 30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007) ........................................................................................ 14, 21, 25

*In re Toronto-Dominion Bank Sec. Litig.,*
  No. 17-1665 (NLH/JS), 2018 U.S. Dist. LEXIS 206043 (D.N.J. Dec. 6, 2018) ...................... 29

*TSC Indus., Inc. v. Northway, Inc.,*
  426 U.S. 438 (1976) ................................................................................................... 12

*United Ass'n Nat'l Pension Fund v. Carvana Co.,*
  759 F. Supp. 3d 926 (D. Ariz. 2023) ............................................................................. 28

*In re VeriFone Holdings, Inc. Sec. Litig.,*
  704 F.3d 694 (9th Cir. 2012) ............................................................................ 15, 20, 21

*Walker v. Beaumont Indep. Sch. Dist.,*
  938 F.3d 724 (5th Cir. 2019) ......................................................................................... 8

*Wu Winfred Huang v. EZCorp, Inc.,*
  No. A-15-CA-00608-SS, 2016 U.S. Dist. LEXIS 143883 (W.D. Tex. Oct. 18, 2016) ............ 27

*Zell v. InterCapital Income Sec., Inc.,*
  675 F.2d 1041 (9th Cir. 1982) ...................................................................................... 12

**Statutes**

15 U.S.C. § 78u-4 ............................................................................................................ 9

**INTRODUCTION**

DZS Inc. ("DZSI") and its chief executive officers committed securities fraud. They knowingly violated generally accepted accounting practices ("GAAP") and provided public investors with false financial statements. These accounting violations came on the heels of representations that DZSI's internal controls over financial reporting had been rehabilitated and were working properly. Indeed, DZSI's chief executive and financial officers attested to those representations in Sarbanes-Oxley Act certifications, claiming that they had personally investigated and confirmed the legitimacy of DZSI's financial statements. When investors later discovered that Defendants were prematurely recognizing millions of dollars in revenue and that DZSI's earnings were significantly worse than initially represented, investors sold off their shares in droves. DZSI was promptly delisted from public trading and thrust into Chapter 7 bankruptcy proceedings.

DZSI's accounting violations were expansive. They touched nearly every line item on DZSI's financial statements and resulted in a commensurate restatement spanning five fiscal quarters (*i.e.*, January 2022 through March 2023). Chief among the restated figures was DZSI's net loss for 2022, which ballooned by 10% from $37 million to $41 million. Similarly, DZSI's net loss for the first quarter of fiscal 2023 (1Q23) went from $17 million to almost $24 million, an increase of nearly 25%. The root cause of the restated financials was DZSI's intentional premature recognition of revenue from contracts that were, at best, tenuous in nature and, at worst, pure fiction. These allegations are supported in detail by confidential witnesses, including "CW1" who held multiple senior positions within DZSI for more than a decade. CW1 also confirms that DZSI's accounting violations were raised and discussed in personal one-on-one meetings with DZSI's senior executives, including CEO Charles Vogt. The accounting violations also led to serial

1

resignations among DZSI's accounting personnel, including CFOs, outside auditors, and consultants.

Defendants do not dispute Plaintiff's core allegations but instead quibble around the edges trying to undermine the credibility of the confidential witness allegations. For example, they describe trivial discrepancies within CW1's descriptions of various conversations and complain that CW1 was not employed by DZSI during the Class Period. But importantly, Defendants neither dispute the falsity of DZSI's financial statements nor the accusations that they prematurely recognized revenue in direct violation of key GAAP provisions. Defendants also fail to provide any credible explanation as to how they overlooked or legitimately believed in the accuracy of DZSI's financial statements when, at the same time, they supposedly personally investigated and verified their internal controls over financial reporting as represented in their Sarbanes-Oxley Act certifications.

Securities fraud plaintiffs are not required to prove their case at the pleading stage. They only need to plead facts capable of supporting an inference of intentional or reckless wrongdoing. Respectfully, Plaintiff has met that standard in this case. Defendants' motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

### A.    Company Background and History

DZSI was a publicly traded telecommunications company that provided broadband network access solutions, cloud-based software and related services. ¶26. DZSI generated revenue primarily from sales of products and services, including, extended warranty service, software and customer support. ¶26.

DZSI was formed in 2016 through a reverse merger between Zhone Technologies ("Legacy

2

Zhone"), a U.S.-based communications equipment manufacturer, and DASAN Network Solutions, a subsidiary of South Korea's DASAN Networks, Inc. ("DASAN"), with DASAN acquiring 58% of DZSI ("2016 Merger"). ¶26.

Following the 2016 Merger, DZSI operated in the U.S., Asia, and EMEA regions and was controlled by Min Woo Nam, the Chairman of DZSI's Board of Director and CEO of DASAN, exerted control over DZSI's operations. ¶40.

Nam exercised pervasive control over DZSI and his other business ventures, blurring the lines between corporate boundaries and compromising DZSI's operations. ¶¶40-41. Besides DZSI, Nam controlled several affiliated entities, including CHASAN Networks Co., Ltd. ("Chasan"), a China-based company. ¶40. There was minimal separation between the various companies under Nam and DZSI. This overlap extended to personnel. For example, Daniel Won, DZSI's Chief Product Officer and Nam's son-in-law, reportedly held dual roles at both DZSI and one of Nam's affiliated companies. ¶40.

Nam's control resulted in preferential treatment for his affiliated businesses, even when doing so harmed DZSI's profit margins. ¶41. For instance, DZSI entered into an agreement with Chasan for Chasan to provide manufacturing and research development services for DZSI at a cost-plus-7% rate despite DZSI having production facilities in Germany and Florida. ¶41.

Besides harming DZSI's profit margins, Nam's control over DZSI also led to internal control problems. DZSI has repeatedly disclosed material weaknesses in its internal control over financial reporting, including in its 2016, 2017, 2018 and 2019 annual filings which ultimately resulted in material errors in the Company's financial statements and the necessity of restatements. ¶28. After nearly five years, DZSI finally stated in its Form 10-K, filed with the SEC on March 11, 2021, for the fiscal year ended December 31, 2020 ("2020 Annual Report"), that it has

"implemented enhanced procedures and controls to remediate the material weaknesses" in its internal control over financial reporting and that the remediation plan had been completed as of December 31, 2020. ¶¶29-32. This was false because, unbeknownst to investors, DZSI's control environment remained rife with fraud.

**B.    DZSI's Fraudulent Accounting**

In truth, improper revenue recognition was pervasive, systematic, and encouraged within DZSI, especially in its EMEA and Asia operations. ¶39. Confidential Witness 1 ("CW1") held multiple positions at DZSI from 2010 to 2021: (1) as business development director from January 2010 to October 2016; (2) as the Vice President of EMEA from October 2016 to April 2021; and (3) as Vice President of EMEA system engineering from April 2019 to November 2020. ¶39. CW1 personally observed widespread improper accounting practices and learned through regular communication with senior management and CW1's counterparts in Asia that similar practices were prevalent in the Asia region as well. ¶39.

CW1 described a systematic practice of prematurely recognizing revenue without purchase orders, before products were ready, and/or for incomplete or undelivered goods. ¶43. These manipulations, typically occurring near quarter-end, involved $1–4 million in orders with long payment terms and were so routine they were given internal nicknames such as "Aladdin orders," "genie orders," and "magic orders." ¶43. For example, BTC Networks, one of the biggest system integrators in the Middle East, would place an order for delivery with 240 days or 360 days payment period. The revenue was recognized in the quarter the order was received but the order would never materialize. ¶44. DZSI promoted $50 million dollars in sale for Rakutan Mobile, Inc. but the demo unit for the alleged device never appeared. ¶44. DZSI also recognized revenue on incomplete products, such as products not customized to client specifications. ¶47.

4

In another instance, management pressured CW1 to prematurely obtain a Provisional Acceptance Certificate ("PAC") for a $10 million contract with Etisalat despite significant project delays that would cause the project to be unable to be completed until a year or two later. CW1 refused as this would destroy CW1's reputation. ¶48. However, DZSI's management persisted; in 2022, DZSI management improperly issued company shares to Etisalat's Chief Technology Officer to secure a PAC. ¶51.

DZSI's internal accounting system was decentralized, opaque, and chaotic, especially in its Asia operations, which CW1 described as "Pandora's Box." ¶52. Confidential Witness 2 ("CW2"), employed as a senior Financial Planning and Analysis Analyst at DZSI from February 2021 to September 2022, corroborated this and further elaborated that DZSI corporate typically received a consolidated package of data from the businesses in Asia without a way to verify the numbers contained in the package. The consolidated corporate package consisted of Excel spreadsheets containing the consolidated numbers from DZSI's operations in Asia but would lack an auditable trail or access to the books or systems used by these Asian counterparts. While there were opportunities for questions, the process was cumbersome, ineffective and time-consuming. ¶54. DZSI's corporate employees would have to go through numerous layers of personnel to communicate their inquiries – often across language barriers – and were not able to "drill down at the customer level to see revenue adjustments." *Id.* Oftentimes, the answers arrived too late, if at all. According to CW2, this arrangement created friction and opportunities for error in the reporting process that management clearly failed to prioritize or address. ¶¶53-54.

C.   **Management's Knowledge and Reckless Disregard**

Senior management, including Defendants Vogt and Kawecki, had direct knowledge of the improper revenue recognition practices or were severely reckless in ignoring them.

In 2017, CFO Kirk Misaka resigned after refusing to sign off on financial statements he believed could expose him to criminal liability. ¶55, 220, 235. That same year, McKinsey & Company refused to rely on DZSI's Korean financials because they were non-GAAP compliant, forcing the Company to switch from McKinsey to Ernst & Young ("EY"). ¶¶55-56.

In 2020, management requested that CW1 prepare a presentation to explain the issues prevalent in the Company. In this meeting that included Chief Revenue Officer Jay Hilbert, CEO Charlie Vogt, and Chief People Officer Laura Larsen-Misunas, CW1 raised concerns about the accounting improprieties at the Company and warned that "[they were] going to destroy the company" because they were "counting on covering up things instead of working to deliver the product." ¶50. Rather than considering CW1's caution, management terminated CW1. ¶50.

Furthermore, during this period, DZSI cycled through four CFOs and multiple auditors in just eight years. ¶57. CFO Kirk Misaka served from 2016 to 2018, resigning after refusing to sign off on financial statements. ¶55. He was replaced by Tom Cancro, who served from 2019 to 2021, followed by Defendant Misty Kawecki, who assumed the role in 2021 and departed in October 2024, two months after DZSI filed its restatement for fiscal year 2022 and the first quarter of 2023. Brian Chesnut then became interim CFO in September 2024 and remained until DZSI's bankruptcy filing in March 2025. ¶57.

The same pattern of instability extended to DZSI's auditors. Besides the 2017 investigation involving Mckinsey and Ernst & Young, DZSI cycled through four auditors. ¶56. PricewaterhouseCoopers LLP ("PwC") was engaged as DZSI's principal U.S. auditor in 2016 but was dismissed in June 2019 and replaced by Grant Thornton LLP. ¶231. Notably, during this period, DZSI repeatedly reported material weaknesses in its internal control over financial reporting, suggesting that the change in auditors was driven by disagreement over financial

6

reporting. ¶231.

Grant Thornton was then dismissed in June 2021, when DZSI again turned to EY to audit its consolidated financials. ¶232. It was during EY's tenure that DZSI filed the original financial documents that needed to be restated. ¶232. Less than two years later, EY resigned in January 2024, a couple of months before DZSI filed its restatements for the fiscal year 2022 and first quarter of 2023, causing DZSI to engage BDO USA, P.C. as its new independent auditor in March 2024. ¶57. The timing of EY's resignation, at a time when accurate financial reporting was most critical, raises serious suspicion about the reasons behind their departure.

Despite these red flags, Defendants Vogt and Kawecki repeatedly certified DZSI's SEC filings, attesting that the financial statements were accurate, internal controls effective, and no material misstatements existed. ¶58, 90, 113, 135, 171, 194, and 213. In reality, DZSI's financials were riddled with errors stemming from improper revenue recognition and control failures.

**D.      The Truth Emerges**

The truth began to emerge on March 10, 2023 when DZSI filed with the SEC its annual report on Form 10-K for the year ended December 31, 2022, ("2022 Annual Report") where DZSI disclosed that their "disclosure controls and procedures were not effective as of December 31, 2022, due to material weakness in internal control over financial reporting…" and attributed the material weakness in internal control to a misapplication of GAAP principles. ¶196. The market reacted sharply and DZSI's stock price dropped around 18% from this disclosure.

The effect of the material weaknesses came to light when on June 1, 2023, DZSI announced that it would restate its previously issued financial statements for the first quarter of 2023, which ended March 31, 2023 (the "June 2023 Form 8-K"). ¶197. On November 9, 2023, DZSI expanded the scope of the restatement, disclosing that its entire 2022 financial statements were unreliable.

¶201. On August 13, 2024, DZSI finally released its restated financials for 2022 and 1Q23. In pertinent part, DZSI restated core financial metrics, such as net revenue, net loss, accounts receivable, current assets, goodwill, and contract liabilities by material amounts. For instance, DZSI's original 1Q22 Quarterly Report showed net revenue of $77,040,000 and a net loss of $3,048,000. ¶82. Following the restatement, these figures were revised to $71,990,000 in net revenue and $7,586,000 in net loss. ¶82. This reflects a 6.55% decline in net revenue and a 148.8% increase in net loss. It was only then that investors finally learned of the extent and scope of DZSI's material weaknesses in its internal controls over financial reporting. ¶203.

DZSI's repeated failures to remediate its internal control weaknesses led to delisting by Nasdaq in October 2024 and, ultimately, its filing for Chapter 7 bankruptcy on March 14, 2025. ¶¶62-63.

## LEGAL STANDARD

Defendants move to dismiss Plaintiffs' complaint under Rule 12(b)(6). A Rule 12(b)(6) motion to dismiss should be denied where the plaintiffs plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In considering a Rule 12(b)(6) motion, "the Court must accept all well-pleaded facts as true, and view them in the light most favorable to the plaintiff." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019).

## ARGUMENT

Securities fraud defendants often move to dismiss under Rule 12(b)(6) arguing that the plaintiffs failed to adequately plead the Rule 10b-5 elements of falsity and scienter. Defendants stray from this norm and instead do not even attempt to challenge Plaintiff's falsity allegations, thereby waiving those arguments and conceding that Plaintiff has for the purposes of the motion

to dismiss adequately pleaded the "falsity" element. *Stiel v. Heritage Numismatic Auctions, Inc.,* 816 F. App'x 888, 891 (5th Cir. 2020) (holding that arguments not raised in the opening brief are waived and will not be considered when raised for the first time in reply). Notwithstanding, Plaintiff addresses the falsity element below to provide context and to underscore the seriousness of Defendants' misconduct, thereby giving rise to the necessary strong inference of scienter.

## A.    **False Misrepresentations**

### 1.    Falsity.

To successfully plead fraud, plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B); *In re ArthroCare Corp. Sec. Litig.,* 726 F. Supp. 2d 696, 703 (W.D. Tex. 2010). Defendants' misstatements are established by their own admissions through the DZSI's multiple restatements and disclosures. Contrary to DZSI's prior representations assuring investors that its financial statements for the fiscal year 2022 and first quarter of 2023 were accurate, representations personally certified by Defendants Vogt and Kawecki in DZSI's SEC filings, DZSI later admitted that these very statements could not be relied on. ¶¶34-38, 213-14. In these certifications, Vogt and Kawecki attested that they had reviewed the reports, that the filings did not contain any untrue statements of material facts or omissions, that the financial statements fairly presented the Company's financial condition, and that they had designed and evaluated effective internal control over financial reporting. ¶¶213-14. However, on June 1, 2023, DZSI announced that its previously issued financial statements for the quarter ended March 31, 2023, "should no longer be relied upon" due to an "accounting error related to two customer projects" and that the Company would issue a restatement. ¶6, 36, 198-199. Five months later, on November 9, 2023, DZSI expanded the

9

scope of its restatement to encompass the entirety of fiscal year 2022, admitting that its internal controls were ineffective and its prior financial reporting materially misstated revenue. ¶7, 37, 201.

On August 13, 2024, DZSI completed the restatement of its fiscal year 2022 and first quarter 2023 financial statements and filed the delayed reports for the remainder of 2023. ¶60, 203. The restated filings revealed material weaknesses across nearly every critical control function within DZSI's finance and accounting systems, including "inadequate oversight and accountability over the performance of control activities primarily in the Asia geographic region," "ineffective identification and assessment of risks," "inadequate education and training," and "ineffective controls over ensuring consistent commitment to integrity and ethical values." ¶203. These admissions confirm that DZSI's earlier representations, specifically, Vogt and Kawecki's certifications that the financial statements fairly presented result, were materially false when made. Furthermore, the restated amounts were not immaterial either. In DZSI's original 1Q22 Quarterly Report, net revenue was reported to be $77,040,000 and net loss to be $3,048,000. ¶82. Following the restatement, these figures were revised to $71,990,000 in net revenue and $7,586,000 in net loss. ¶82. This reflects a 6.55% decline in net revenue and a 148.8% increase in net loss.

Courts have consistently held that restatements constitutes an admission that prior financial statements were false when issued. *See In re ArthroCare Corp.,* 726 726 F. Supp. 2d at 710 ("[T]here is no question Plaintiff has successfully plead falsity in the CCAC, as the sweeping Restatement filed by ArthoCare operates as an admission its public filings…were false."); *Kaltman v. Key Energy Services, Inc.,* 447 F. Supp. 2d 648, 656 (W.D. Tex. 2006) (finding defendants' announcement of the need to restate its earning "constitutes an admission that its public filings are false" even when no restatement has been filed at the time the complaint was filed); *In re Fleming Cos. Inc. Sec. & Derivative Litig.,* No. 5:03-MD-1530, 2004 U.S. Dist. LEXIS 26488, at *75 (E.D.

10

Tex. June 10, 2004) ("[T]he announcement of the need to restate earnings constitutes an admission that the information contained in the public filings is false."); *see also In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F.Supp.2d 474, 486 (S.D.N.Y. 2004) ("Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made."); *In re Cylink Securities Litigation,* 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001) (holding that the mere fact that financial statements were restated at all is sufficient to support an inference of falsity at the pleading stage).

Judge T. John Ward's holding in *Fleming* is instructive. In *Fleming*, the defendants engaged in improper revenue recognition practices, such as imposing unauthorized and baseless vendor deductions and inflating same-store sales, that led to the announcements of restatements and the company's subsequent bankruptcy. *In re Fleming Cos*., 2004 U.S. Dist. LEXIS 26488, at *75. The district court  held that "the announcement of the need to restate earnings constitutes an admission that the information contained in the public filings is false," and that "the magnitude alone of the forecasted restatement is a testament to its materiality." *Id.*, at *74, 76.

Similarly, in *ArthroCare*, the company prematurely recognized revenue by encouraging end-of-quarter bulk sales and permitting returns in the following quarter. *In re ArthroCare*, 726 F. Supp. 2d at 705. When ArthroCare was forced to restate its financials, the court held plaintiffs had adequately pled falsity as the "sweeping Restatement filed by ArthroCare operates as an admission its public filings . . . were false in many material respects." *Id.* at 705, 710.

DZSI's conduct mirrors the conduct of the defendants in these cases, showing that DZSI's restatement likewise functions as an admission of falsity and wrongdoing. Indeed, Defendants made representations in SEC filings that DZSI's financial statements for the fiscal year 2022 and first quarter of 2023 were accurate; these representations were certified by Vogt and Kawecki who

11

attested that they had reviewed the reports, that the filings did not contain any untrue statements of material facts or omissions, that the financial statements fairly presented the Company's financial condition, and that they had designed and evaluated effective internal control over financial reporting. ¶¶34-38, 213-14.

Yet, on June 1, 2023, DZSI announced that its financial statements for the quarter ended March 31, 2023, would be restated. ¶6, 36, 198-199. On November 9, 2023, DZSI made a similar restatement announcement for the entire fiscal year of 2022. These announcements alone are sufficient to establish falsity. ¶7, 37, 201.

2.      Materiality.

"A statement of fact is 'material' if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest" or if "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Kaltman,* 447 F. Supp. 2d at 659; *Basic v. Levinson,* 485 U.S. 224, 226 (1988). Materiality should only be resolved as a matter of law where the omitted fact is "so obviously unimportant that no reasonable shareholder could have viewed it as significantly altering the total mix of information made available to stockholders." *Zell v. InterCapital Income Sec., Inc.,* 675 F.2d 1041, 1045 (9th Cir. 1982) (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)).

Courts routinely hold that the very fact that a company must restate its financial results establishes materiality. *See Gimpel v. Hain Celestial Grp., Inc.,* No. 23-7612, 2025 U.S. App. LEXIS 25123, *32 (2d Cir. Sept. 29, 2025) (finding defendants' "subsequent restatement of its financial results and disclosure of material weaknesses in its internal controls and financial-reporting and accounting practices" false and material); *Fresno Cty. Emples. Ret. Ass'n v.*

*comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017) ("Under GAAP, 'previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were originally issued.'") (quoting *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004)). The magnitude of a restatement further reinforces its materiality. *In re Fleming Cos.,* 2004 U.S. Dist. LEXIS 26488, at *74, 76.

The fact that Defendants were required to restate their financial statements is itself evidence that the previously reported information was materially inaccurate; the magnitude of the restatement and the specific changes to the reported figures provide further confirmation of that materiality. In DZSI's original 1Q22 Quarterly Report, DZSI reported net revenue of $77,040,000 and a net loss of $3,048,000. ¶82. After restatement, those figures changed to $71,990,000 and $7,586,000, respectively. ¶82. This represented a decrease of 6.55% in net revenue and an increase of 148.8% in net loss. Such shifts are plainly material to any reasonable investor assessing DZSI's financial performance. Similar restated figures across other quarters and balance-sheet categories, including but not limited to accounts receivable, current assets, goodwill, and contract liabilities, only reinforce the magnitude and pervasiveness of the misstatements. Taken together, DZSI's admissions, restatements, and the scale of its financial revisions conclusively establish both falsity and materiality. *See Gimpel,* 2025 U.S. App. LEXIS 25123, at *32; *Fresno Cnty. Emps.' Ret. Ass'n,* 268 F. Supp. 3d at 544; *In re ArthroCare,* 726 F. Supp. 2d at 705; *In re Fleming Cos.*, 2004 U.S. Dist. LEXIS 26488 at *74, 76.

**B.    Scienter**

The scienter element of a Section 10(b) claim is a "mental state embracing intent to deceive, manipulate, or defraud." *Kaltman,* 447 F. Supp. 2d at 662 (quoting *Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 430 (5th Cir. 2002)). Under the PSLRA, a plaintiff must plead specific facts giving

rise to a "strong inference" of scienter to survive a motion to dismiss. *Id.*

When determining whether a complaint adequately pleads scienter under § 10(b) and Rule 10b-5, courts must consider all allegations holistically, rather than in isolation, to decide whether they collectively give rise to a strong inference of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007); *see also Owens v. Jastrow*, 789 F.3d 529, 536 (5th Cir. 2015). Allegations of severe recklessness or circumstantial evidence can suffice to support such a strong inference. *Kaltman,* 447 F. Supp. 2d at 662. If competing inferences are equally plausible, the inference favoring scienter should be drawn in favor of the plaintiff at the motion to dismiss stage. *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Entm't Corp.,* 58 F.4th 195, 214 (5th Cir. 2023).

Scienter is adequately pleaded where defendants "had a reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *In re ArthroCare,* 726 F. Supp. 2d at 724. "A red flag creating a strong inference of scienter generally consists of an egregious refusal to see the obvious, or to investigate the doubtful." *Id.* at 696.

1.    Defendants Had Direct Knowledge of and Were Involved in the Fraud.

DZSI's improper revenue recognition practices were not isolated mistakes, but part of a persistent, company-wide pattern encouraged by senior leadership, including Defendants Vogt and Kawecki. DZSI routinely booked revenue on unplaced or incomplete orders and recognized sales before delivery or customer acceptance. ¶¶39, 43-47. These transactions were not accidental. They involved multimillion-dollar deals and were so routine they were internally referred to as "Aladdin," "genie," and "magic" orders. ¶43. CW1, a senior executive who served as Vice President of EMEA from 2016 to 2021, recounted that management repeatedly pressured employees to prematurely recognize revenue and to secure project acceptances that had not been earned. ¶48. When CW1

14

refused to comply and directly warned Vogt in 2020 that the practice was "destroying the company" because DZSI was "counting on covering up things instead of working to deliver the product," DZSI terminated him shortly thereafter. ¶50. This retaliation demonstrates Defendants' awareness of and participation in the very practices CW1 sought to expose.

The circumstances here closely mirror those in *Fleming* where the defendants engaged in improper revenue recognition through unapproved deductions and inflated sales data, practices that ultimately led to massive restatements and bankruptcy. 2004 U.S. Dist. LEXIS 26488, at *5-14. The court held that plaintiffs adequately alleged scienter because the complaint contained both circumstantial and direct evidence of the defendants' knowledge and involvement in the accounting manipulation. *Id.* at *94. There, as here, confidential witnesses described the defendants' awareness of, and pressure to engage in, improper accounting practices, which the court found sufficient to plead scienter at the motion-to-dismiss stage. *Id.* at *60, 96.

Just as in *Fleming,* the allegations here go beyond mere corporate mismanagement. They establish that DZSI's senior executives, including Vogt and Kawecki, were not only aware of but actively participated in revenue manipulation. The direct meeting between CW1 and Vogt, during which Vogt was explicitly warned about the improper revenue recognition practices, confirms actual knowledge of the misconduct. DZSI's subsequent termination of CW1 instead of investigating the issue reflects deliberate disregard and is consistent with the pattern of concealment recognized in *Fleming*. Similarly, courts have found scienter where executives respond to poor financial performance by manipulating accounting results to meet expectations, as such actions demonstrate knowing misconduct rather than negligence. *See In re VeriFone Holdings, Inc. Sec. Litig.,* 704 F.3d 694, 709 (9th Cir. 2012) (scienter where defendants addressed "unacceptable" earnings by directing accounting adjustments "to conform results to expectations").

15

The "tone at the top" at DZSI further supports scienter. The confidential witnesses describe an environment where aggressive accounting tactics were expected, and internal controls were disregarded.  Employees were regularly pressured to record revenue before it was earned, and, as CW2 explained, corporate staff were often unable to verify revenue adjustments at the customer level because data were consolidated from unauditable spreadsheets and corporate personnel lacked access to the underlying books and systems. ¶¶43, 52-54. The pervasive revenue manipulation, the executives' direct involvement, and the pattern of retaliation against whistleblowers all point to a deliberate environment in which compliance was subordinated to alleged financial performance. This is precisely the type of corporate culture that courts have found to corroborate fraudulent intent. *See Gimpel*, 2025 U.S. App. LEXIS 25123, at *52 (defendants' maintenance of an "inappropriate 'tone at the top,' i.e., a company culture of secrecy and fear, and poor internal controls" provided a final "gloss" for a strong inference of scienter).

Taken together, the pervasive and long-standing nature of DZSI's improper revenue recognition, Defendants' direct involvement and retaliation against CW1, and the culture of concealment at the top all support a strong inference that Defendants acted knowingly or, at the very least, with deliberate recklessness.

2.      The Pattern of Changes in Key Personnel and Auditors Constitutes a Clear Red Flag that Contributes to a Strong Inference of Scienter.

A sustained pattern of turnover among key financial personnel and auditors is an important red flag supporting scienter. *See Gimpel*, 2025 U.S. App. LEXIS 25123, at *60; *In re ArthroCare,* 726 F. Supp. 2d at 724 (repeated red flags contributed to the inference of scienter*); In re AOL Time Warner Sec. & "ERISA" Litig.,* 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004) ("[a]llegations of 'red flags,' when coupled with allegations of GAAP and GAAS violations, are sufficient to support a

strong inference of scienter"). Here, DZSI cycled through four chief financial officers and multiple independent auditors in only eight years. ¶57. Such turnover in financial leadership, particularly when coupled with other warning signs of accounting irregularities, strongly suggests awareness at the top of serious problems within the Company's financial reporting processes. *See In re Pareteum Sec. Litig.,* No. 19-CV-9767 (GHW), 2021 U.S. Dist. LEXIS 151106, *49 (S.D.N.Y. Aug. 11, 2021) ("The timing of terminations and resignations, in relation to the magnitude of corrections in a restatement, also can be a strong inference of scienter"); *In re Scottish Re Grp. Sec. Litig.,* 524 F. Supp. 2d 370, 395 (S.D.N.Y. 2007) ("the additional 'highly unusual and suspicious facts' [of CEOs resignation] lend further support to the inference of scienter in this case.").

In this case, the timing and circumstances of the departures underscore that inference. In 2017, CFO Kirk Misaka resigned after refusing to sign financial statements he believed could expose him to criminal liability, while McKinsey & Company refused to rely on DZSI's Korean financials because they were non-GAAP compliant. ¶¶55-56. These events happened at the same time that DZSI was undergoing an investigation relating to revenue recognition. ¶55. Thereafter, the Company cycled through CFOs Cancro, Kawecki, and Chesnut, and successively replaced its independent auditors, including PwC, Grant Thornton, EY, and BDO. ¶57. This revolving door of financial gatekeepers, both internal and external, was a clear warning sign of serious accounting dysfunction. The frequency and timing of these departures, particularly among those charged with ensuring financial accuracy, would have alerted any reasonable executive to the existence of pervasive issues within the Company's accounting and reporting practices.

When viewed in context, this pattern of departures was not a coincidence but part of a broader breakdown in financial control. The repeated changes among DZSI's financial leadership, coupled with the magnitude and scale of contemporaneous restatements, reflect a company

17

grappling with pervasive accounting misconduct known or recklessly disregarded by senior management, including CEO Vogt and CFO Kawecki. *See In re Pareteum,* 2021 U.S. Dist. LEXIS 151106, at *49; *In re Scottish Re, 524* F. Supp. 2d at 395.

      3.      <u>The Magnitude and Materiality of the Restatements and Remedial Measures Contribute to a Strong Inference of Scienter.</u>

DZSI's restatement themselves serve as additional evidence of scienter, given their scope and magnitude. On August 13, 2024, DZSI restated its financial statements for the entirety of fiscal year 2022 and the first quarter of 2023, a period of five quarters that Defendants Vogt and Kawecki had certified as accurate. ¶¶58, 60, 203, 213-14. The revisions affected nearly every material financial metric, including net revenue, net loss, accounts receivable, current assets, goodwill, and contract liabilities, in material amounts. ¶82. For instance, once DZSI's financial statements were restated, Q1 2022 net revenue fell by 6.55%, and net loss increased by 148.8%. ¶82. The Company's remedial measures further confirm the depth of the misconduct. Following the restatement, DZSI acknowledged "widespread material weaknesses" across virtually all control functions and to correct these failures DZSI had to undertake massive remediation effort. ¶203.

The magnitude and scope of a restatement may support scienter, particularly where the errors concern fundamental accounting principles like revenue recognition. *See In re Seitel, Inc. Sec. Litig.,* 447 F. Supp. 2d 693, 705 (S.D. Tex. 2006) (finding that the magnitude of a restatement significantly contributed to a finding of scienter); *In re Fleming Cos.,* 2004 U.S. Dist. LEXIS 26488, at *74 (holding that the magnitude or size of the restatement and the simplicity of the accounting shall configure significantly into the court's calculus concerning whether the plaintiffs have adequately pleaded scienter); *In re MicroStrategy, Inc. Secs. Litig.,* 115 F. Supp. 2d 620, 652

(E.D. Va. 2000) (holding that the magnitude of the restatement, simplicity of the GAAP violations, and ease of detection supported an inference of deliberate ignorance and scienter).

Similar to *Seitel, Fleming,* and *MicroStrategy*, DZSI's restatements involved fundamental accounting principles, were straightforward in nature, and affected nearly every material financial metric over multiple reporting periods. The magnitude, scope, and ease of detection of the errors, combined with the extensive remedial measures undertaken and all the other red flags alleged, strongly support a compelling inference that Defendants Vogt and Kawecki acted with knowledge or reckless disregard of the company's improper revenue recognition practices.

4.      The SOX Certifications Contribute to a Strong Inference of Scienter.

Despite the numerous red flags warning of improper accounting practices and a long history of material weaknesses in internal control over financial reporting, Vogt and Kawecki repeatedly certified DZSI's SEC filings, attesting that the financial statements were accurate, internal controls effective, and no material misstatements existed. ¶¶58, 90, 113, 135, 171, 194, 213-16. Each certification, made pursuant to the Section 302 of the Sarbanes-Oxley Act ("SOX"), affirmed that Vogt and Kawecki had reviewed the Company's report and that, to their knowledge, the filings contained no false statements or omissions and that they were responsible for maintaining, designing, and evaluating the effectiveness of DZSI's disclosure and internal controls over financial reporting and that such controls were functioning properly. ¶214. These representations, as demonstrated by the restatements, were false when made. ¶215.

The Fifth Circuit has consistently held that SOX certifications, when made in the face of "glaring accounting irregularities" or known internal control problems, contribute to a strong inference of scienter. *Cent. Laborers' Pension Fund v. Integrated Elec. Servs.,* 497 F.3d 546, 555 (5th Cir. 2007) (SOX certifications may contribute to an inference of scienter if the person signing

19

had reason to know or should have suspected, due to the presence of glaring accounting irregularities or other "red flags," that the financial statements contained material misstatements or omissions); *In re ArthroCare,* 726 F. Supp. 2d at 724 (finding that SOX contributed strongly to inference of scienter when combined with the other facts that showed that individual defendants had reason to know or suspect the financial statements). To disregard the SOX certifications entirely would reduce the Sarbanes-Oxley requirements to mere boilerplate formalities. *In re Lattice Semiconductor Corp. Sec. Litig.,* No. 05-CV-1179-AA, 2006 U.S. Dist. LEXIS 262, at *50-51 (D. Or. Jan. 3, 2006) (finding that SOX certifications contributed to an inference of scienter because to disregard it would treat the Sarbanes-Oxley requirements as mere boilerplate).

In this case, Vogt and Kawecki signed multiple SOX certifications during a period marked by glaring account regularities and obvious "red flags," including a previous report of pervasive revenue recognition in the Company and repeated CFO and auditor turnover in highly suspicious contexts. ¶¶50, 55–57. Further, the magnitude of the restatement, the scope of remedial measures, and the simplicity of the GAAP violations leave no doubt that Vogt and Kawecki either knew, or were severely reckless in not knowing, that their certifications were false when made. Therefore, the false SOX certifications here contribute to a strong inference that Defendants acted with scienter. *Cent. Laborers' Pension Fund,* 497 F.3d at 555; *In re ArthroCare,* 726 F. Supp. 2d at 724.

Taken together, the direct report from CW1 in 2020,[1] the toxic "tone at the top,"[2] a pattern of key personnel changes,[3] the simplicity of the GAAP violations, the magnitude of the

---

[1] *See In re VeriFone,* 704 F.3d at 709; *In re Fleming Cos.*, 2004 U.S. Dist. LEXIS 26488, at *60.
[2] *See Gimpel,* 2025 U.S. App. LEXIS 25123, at *52.
[3] *See id.*, at *60*; In re Pareteum,* 2021 U.S. Dist. LEXIS 151106*, *49; In re ArthroCare,* 726 F. Supp. 2d at 724; *In re Scottish Re Grp. Sec. Litig.,* 524 F. Supp. 2d 370.

20

restatement,[4] and the false SOX certifications[5] create a powerful mosaic of circumstantial and direct evidence of scienter. The scale of DZSI's accounting misconduct and subsequent restatements "constitutes not only circumstantial evidence but direct evidence" of knowledge and participation in the fraud. *See In re Fleming Cos.,* 2004 U.S. Dist. LEXIS 26488, at *94. Even if Vogt and Kawecki claim to be not aware of the improper accounting practices that led to the necessity for restatement, they were recklessly turning a blind eye to this impropriety and that is equally culpable under *Rule* 10b-5. *In re VeriFone,* 704 F.3d at 708-09 (holding that defendants were aware of internal control deficiencies and that plaintiffs sufficiently alleged defendants were, at minimum, reckless in ignoring or turning a blind eye to the practice of manual adjustments).

### 5.   Defendants Do Not Provide an Alternative Inference of Nonculpable Conduct.

Defendants attempt to recast Plaintiff's well-supported allegations as speculation, largely by attacking the credibility of confidential witnesses and dissecting the Complaint piecemeal rather than addressing the collective weight of the allegations. However, when analyzing a complaint for scienter, the court must "assess all the allegations holistically," not in isolation. *Tellabs*, 551 U.S. at 326; *see also Owens,* 789 F.3d at 536. When the allegations are viewed together, the widespread revenue recognition misconduct, direct notice to senior executives, pattern of key personnel change, tone at the top, repeated material weaknesses, and magnitude of the restatement, they create a strong inference of scienter at least as compelling as any opposing inference.

Defendants' argument centers on discrediting the Complaint's CWs, claiming their statements are unreliable, speculative, or inconsistent. But the courts have held that confidential witness statements are properly considered at the pleading stage where, as here, they are described

---

[4] *In re Seitel,* 447 F. Supp. 2d at 705; *In re Fleming Cos.,* 2004 U.S. Dist. LEXIS 26488, at *74; *In re MicroStrategy, Inc.,* 115 F. Supp. 2d at 652.
[5] *Cent. Laborers' Pension Fund,* 497 F.3d at 555*; In re ArthroCare,* 726 F. Supp. 2d at 724.

with sufficient particularity to support the probability that witnesses had personal knowledge of the events alleged. *See ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002) (CWs can be relied on so long as they are described with "sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief"); *In re Fleming Cos.,* 2004 U.S. Dist. LEXIS 26488, at *28. (confidential sources sufficiently reliable where described in detail and in positions to know the relevant facts).

Here, the Complaint more than meets this standard. CW1 and CW2's roles are described with specificity, including their job titles, tenure, responsibilities, and reporting lines, each of which provided direct access to DZSI's financial operations. ¶¶39, 53. CW1 was employed at DZSI for over 10 years and served as Vice President of EMEA from 2016 to 2021; he reported directly to DZSI's CEO and Vice President of International Sales. ¶39. CW2 was a Senior Financial Planning and Analysis Analyst from February 2021 to September 2022, supporting public month-end reporting and financial materials. ¶53. These are precisely the types of sources courts deem reliable because they held senior roles with direct visibility into financial reporting and operations concerning revenue recognition.

Furthermore, CW1 need not have held an accounting role or been employed during the Class Period, as Defendants' claim, to competently describe the pervasive and long-standing nature of DZSI's revenue recognition violations. Defs. Br. at 15, 17, 19. The restatements confirm the GAAP violations at DZSI. CW1's statements provide critical context regarding how deeply entrenched and widespread those improper practices were throughout DZSI's operations.

Defendants' reliance on *Nguyen* is misplaced. *Nguyen* rejected CW allegations not solely due to the CW not being employed during the class period but because the witness lacked details

22

about the reports at issue and had no personal knowledge of the alleged misconduct. *Nguyen v. Endologix, Inc.,* 962 F.3d 405 (9th Cir. 2020). That is not the case here. CW1 directly observed improper revenue recognition practices, reported them internally, and was terminated shortly thereafter. The close temporal proximity to a protected activity strongly suggested that CW1 was terminated for said protected activity. *Brown v. Wal-Mart Stores E., L.P.,* 969 F.3d 571, 578 (5th Cir. 2020) (Temporal proximity between the termination and the protected conduct may be sufficient to establish causation). CW1's tenure, even if ending before the Class Period, is probative of the environment that persisted into it, particularly where the same revenue practices likely led to the need for restatements.

Defendants also claim that CW1's statements are inconsistent and attempt CW1 as a disgruntled former employee motivated by termination. Defs. Br. at 9, 15, 16, 18. However, any minor discrepancies in phrasing or quotation are, at most, technical drafting issues, not substantive contradictions, just like Defendants' MTD that mis-cites several paragraphs of the Complaint. Defs. Br. at 16, 18. Furthermore, Defendants' attack on the consistency of CW1's statement reaches into the issue of credibility, which is not appropriate for consideration at the pleading stage. *See Luczak v. Nat'l Bev. Corp.*, 812 F. App'x 915, 924 (11th Cir. 2020) ("The defendants offer a number of reasons to doubt the credibility of the allegations supported by these confidential witnesses. Again, the defendants may well turn out to be right, but it is improper to weigh the evidence in this way on a motion to dismiss."); *Samuels v. Henry,* No. 1:23-cv-00132, 2025 U.S. Dist. LEXIS 185526, at *6 (N.D. Tex. Sept. 22, 2025) ("[T]he Court may not make credibility determinations at the pleading stage."). However, even if it was a consideration at this stage, substantively, CW1's statements have remained consistent: DZSI engaged in premature and improper revenue recognition and CW1 directly reported these practices to

Defendant Vogt in 2020. ¶¶50, 226.

Defendants' reliance on *Higginbotham* to allege that CW1's statements should be discounted is similarly inappropriate and unfound. Defs. Br. at 13, 15. *Higginbotham v. Baxter Int'l Inc.,* 495 F.3d 753, 757 (7th Cir. 2007). The Seventh Circuit's concern centered around the anonymity of the purported witnesses and the possibility that they might be fictitious or merely disgruntled employees with an axe to grind. *Id.* The concern about fictitious employee is not present here, and Defendants offer no facts to support the plainly laughable theory that CW1 is a disgruntled former employee upset about his termination. CW1 is a verifiable, high-ranking former executive whose statements are detailed, consistent, and corroborated by the Company's restatements and other red flags. To reject CW1's statement solely because he was terminated would effectively write off all whistleblower statements, a result both illogical and contrary to the purpose of confidential reporting.

Defendants further argue that, even assuming the confidential witnesses' accounts are true, they fail to establish scienter. Defs. Br. at 17-21. This argument ignores the depth and specificity of the witnesses' accounts and the corroborating red flags. CW1, a high-ranking executive who served as Vice President of EMEA and reported directly to senior management, described in detail DZSI's long-standing and pervasive improper revenue recognition practices, including the premature recognition of revenue for incomplete or nonexistent orders, conduct that was so systemic it was internally referred to as "Aladdin" or "magic" orders. ¶¶43-48. While CW1 was employed before the Class Period, CW1 sufficiently alleged an improper conduct that was so pervasive, it must have been obvious to senior management, including Vogt and Kawecki, not to mention CW1's meeting with Vogt where CW1 directly told Vogt about the revenue recognition issue.

24

Defendants further contend that plaintiffs' case fails for lack of alleged motive, that argument is mistaken. The Fifth Circuit has made clear that motive and opportunity could be "relevant" to pleading scienter and "may, on occasion, rise to the level of creating a strong inference of reckless or knowing conduct" what is core is not motive and opportunity but particularized facts giving rise to a strong inference of scienter. *See Nathenson v. Zonagen Inc.,* 267 F.3d 400, 421 (5th Cir. 2001). Defendants' reliance on cases such as *Gamboa* is misplaced. *Gamboa v. Citizens, Inc.,* No. A-17-CV-241-RP, 2018 U.S. Dist. LEXIS 76457, at *10 (W.D. Tex. May 7, 2018). In *Gamboa*, the absence of motive was not dispositive; rather, the court found that other inferences weighed against scienter. That is not the case here as Plaintiffs have sufficiently pleaded particularized facts compelling a strong inference of scienter.

Defendants also attempt to disaggregate each of the red flags that Plaintiffs put forth and claim that each alone does not lend to an inference of scienter. However, the Court must assess whether the facts and circumstances, taken together, are sufficient to support a strong inference of scienter. *Tellabs*, 551 U.S. at 326; *see also Owens,* 789 F.3d at 536.; *In re VeriFone,* 704 F.3d at 710 ("Although [Defendants] attack individual allegations in isolation, they cannot overcome the overwhelming inference drawn from a holistic view."). Here, Plaintiffs have adequately alleged that each red flag, individually and collectively, compels a strong inference that Defendants knew or should have known of the improper revenue recognition practices.

Beyond CW1's direct reporting, DZSI experienced a prolonged pattern of instability in critical financial roles, cycling through four CFOs and multiple independent auditors over eight years. Defs. Br. at 24-28. This revolving door included CFO Misaka's resignation after refusing to certify financial statements that could expose him to criminal liability, and McKinsey & Company's refusal to rely on DZSI's non-GAAP Korean financials. Both are red flags that clearly

25

signaled serious accounting irregularities.

Defendants' attempts to downplay these events are unavailing. Their contention that Misaka remained employed by DZSI in another capacity after stepping down as CFO does not alter the fact that he resigned from his role as the Company's top financial officer because of accounting concerns. Likewise, the fact that McKinsey was not DZSI's independent auditor is immaterial; McKinsey's refusal to rely on DZSI's Korean financial statements because they were non-GAAP-compliant underscores the breakdown of financial integrity within the organization.

Compounding these structural warning signs, the Sarbanes-Oxley certifications on the SEC filings[6], the simplicity of the GAAP violated[7], the magnitude of the restatement and remedial measures,[8] a pattern of key personnel changes[9], and the tone at the top[10] all strongly contribute to a strong inference of scienter.

Furthermore, while Defendants attempt to divert attention to the fact that CW2 did not report these practices directly to Vogt and Kawecki and that CW1's tenure did not overlap with Kawecki, this argument misses the point. CW2's accounts of a dysfunctional and disjointed accounting system prone to inefficiencies and a heightened risk of improprieties for a company

---

[6] *In re ArthroCare,* 726 F. Supp. 2d at 696 (scienter is adequately pleaded where executives who signed the Sarbanes-Oxley certifications had a reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other "red flags," that the financial statements contained material misstatements).

[7] *In re Fleming Cos.* 2004 U.S. Dist. LEXIS 26488, at *74, 117 (holding that the magnitude or size of the restatement and the simplicity of the accounting shall configure significantly into the court's calculus concerning whether the plaintiffs have adequately pleaded scienter"); *In re MicroStrategy,* 115 F. Supp. 2d at 652. (holding that the magnitude of the restatement, simplicity of the GAAP violations, and ease of detection supported an inference of deliberate ignorance and scienter).

[8] *Id.*

[9] *Gimpel*, 2025 U.S. App. LEXIS 25123, at *55 ("[K]ey personnel changes . . . may add to the total mix of circumstantial evidence of fraud when those changes are 'highly unusual and suspicious'").

[10] *Id.* at *52 (maintenance of an "inappropriate 'tone at the top,' *i.e.*, a company culture of secrecy and fear, and poor internal controls" supported inference of scienter).

corroborates CW1's description of pervasive revenue manipulation support a strong inference of scienter. ¶¶53-54. CW2, who served as a Senior Financial Planning and Analysis Analyst at DZSI from February 2021 to September 2022, explained that DZSI's corporate office received only consolidated data packages from its Asian operations (Excel files without an auditable trail) leaving employees unable to verify revenue adjustments at the customer level. ¶54. This systemic lack of transparency created opportunities for error and manipulation, especially within a company already plagued by years of accounting irregularities.

*Huang* is easily distinguishable here. *Wu Winfred Huang v. EZCorp, Inc.*, No. A-15-CA-00608-SS, 2016 U.S. Dist. LEXIS 143883 (W.D. Tex. Oct. 18, 2016). Notably, the *Huang* court did not find CW allegations of disorganized or inefficient process and procedures unsupportive of scienter, but rather, that the alleging CW lacked personal knowledge of the events described (occurring 9 to 12 months before joining the company in October 2012), and therefore, was deemed unreliable. *Id.* at *9. Further, the CW in *Huang* "failed to specify the contents of the reports," and therefore, the court found their statements "too vague" to support finding that "the alleged deficiencies were included in the reports." *Id.* Here, by contrast, CW2 provided first-hand, contemporaneous observations, specifying what information was included in DZSI's consolidated data package, who prepared it, and why it could not be verified, which demonstrates direct knowledge of the reporting failures described. ¶54.

*Abrams* and *Goldstein* are also inapposite here. *Goldstein v. MCI WorldCom,* 340 F.3d 238 (5th Cir. 2003); *Abrams v. Baker Hughes Inc.,* 292 F.3d 424 (5th Cir. 2002). In both cases, unlike here, plaintiffs' access to information allegations rested solely on defendants' corporate positions. *Goldstein*, 340 F.3d at 252-54; *Abrams*, 292 F.3d at 432. Here, Plaintiffs allege far more. CW2's detailed description of the structural deficiencies in DZSI's accounting process, combined with

27

CW1's direct report to Vogt and the numerous red flags Defendants ignored, support the inference that the Vogt and Kawecki knew DZSI was publishing "inaccurate accounting figures or fail[ed] to follow GAAP," or at minimum, was "severely reckless in publishing such information." *Abrams,* 292 F.3d at 432*; see New Orleans Emps. Ret. Sys. v. Celestica, Inc.,* 455 F. App'x 10, 14 (2d Cir. 2011) (finding confidential witness allegations "as to who prepared the spreadsheets, how frequently they were prepared, who reviewed them, and the issues they addressed" sufficient to support inference that individual defendants were "informed" of internal management problems "consistent with plaintiffs' theory of the underlying fraud"); *cf. Heck v. Orion Grp. Holdings, Inc.*, 468 F. Supp. 3d 828, 856 (S.D. Tx. 2020) (finding plaintiffs failed to specify what the confidential witness told defendant when they allegedly spoke directly "or why whatever CW1 told [defendant] is capable of establishing that [they] knew or was severely reckless in not knowing that any statements ... were false and misleading").

Further, that CW2 does not also allege "direct contact with the [Individual] Defendants does not undermine their evidence." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.,* 63 F.4th 747, 769 (9th Cir. 2023) (crediting CW allegations even without direct contact with defendants); (crediting CW allegations even without direct contact with defendants); *United Ass'n Nat'l Pension Fund v. Carvana Co.,* 759 F. Supp. 3d 926, 976 (D. Ariz. 2023) (confidential witnesses need not have had direct contact with defendants for their statements to support scienter); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 Civ. 1580 (LGS), 2018 U.S. Dist. LEXIS 87991, at *30-31 (S.D.N.Y. May 24, 2018) (lack of direct contact does not undermine evidence). *See also In re Avon Sec. Litig.*, No. 19 Civ. 01420 (CM), 2019 U.S. Dist. LEXIS 200816, at *64 (S.D.N.Y. Nov. 18, 2019) ("The notion that [former employees] cannot be believed because none had direct contact with any individual Defendant is contrary to law."); *Spitzberg v. Houston Am. Energy*

28

*Corp.,* 758 F.3d 676, 682 (5th Cir. 2014) (crediting allegations by CW who worked for non-party business partner of company and had no interactions with the individual defendants).

CW2 did not merely opine on facts as to which they had no personal knowledge. Instead, CW2 described the exact mechanism by which corporate management received unverifiable data from the Company's Asian subsidiaries, thereby showing that the risk of manipulation was not only foreseeable but evident. These allegations, when considered alongside CW1's account of management's active promotion of premature revenue recognition, the pattern of executive and auditor turnover, and other red flags, together raise a compelling inference of scienter. *See*, *e.g.*, *Grae v. Corr. Corp. of Am.*, No. 3:16-cv-2267, 2017 U.S. Dist. LEXIS 207475, at *65 n.8 (M.D. Tenn. Dec. 18, 2017) (rejecting defendant's contention to discredit CW that "has not claimed to have spoken directly to any of the Individual Defendants" but alleges they "were among the senior executives who routinely received QAD [Quality Assurance Division] information" which included pertinent results indicative of the underlying fraud finding plaintiff sufficiently "explained the basis of [CW]'s claims: as a QA manager, he was ensconced in the company's QA processes and knowledgeable of the company's practices."); *see also In re Toronto-Dominion Bank Sec. Litig.*, No. 17-1665 (NLH/JS), 2018 U.S. Dist. LEXIS 206043, at *35 (D.N.J. Dec. 6, 2018) (crediting the accounts of CWs who had no interactions with the individual defendants but provided "some indications that individuals at the corporate office were aware of the underlying issues disclosed by the CWs" finding the court "may infer from these allegations that Individual Defendants either knew or the improprieties were so obvious that they must have been aware").

The CWs collective accounts of pervasive revenue manipulation show that these practices were deeply embedded in DZSI's financial reporting structure and the restatements show that these practices were not remedied in the Class Period. ¶¶43–48. When Kawecki became CFO, she

29

inherited the same flawed accounting systems and personnel that facilitated those practices. ¶57. Even if she did not initiate these accounting irregularities, she should have known or was severely reckless in not knowing about these improprieties.

Thus, the lack of temporal overlap or direct reporting does not undermine the CWs' reliability. Rather, it reinforces that the misconduct was entrenched and would have been apparent to any incoming executive exercising minimal diligence. Taken together, the continuity of these practices supported by the CW statements, coupled with Kawecki's later certification of financial statements later restated as materially false, and the red flags alleged above sufficiently plead that Defendants knew or were reckless in ignoring the widespread improper revenue recognition practices at DZSI, which ultimately led to the restatements at issue in this case.

## **CONCLUSION**

Plaintiff respectfully requests that Defendants' motion be denied in its entirety.[11]

*[Signature blocks on following page]*

---

[11] Defendants' motion to dismiss Plaintiff's Section 20(a) claim for control person liability should be denied as well. Having adequately pleaded a primarily violation under Section 10(b), it is of no moment that [DZSI] is not a named defendant due to bankruptcy." *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 486 n.203 (S.D.N.Y. 2010) (citing *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 285 (3d Cir. 2006) ("[T]here is no requirement in the language of [Section 20(a)] that the controlled person be named as a defendant as a predicate to imposing liability upon the controlling individual defendants.")); *see also SEC v. Hawk*, No. 03:05-CV-00172-LRH-VPC, 2007 U.S. Dist. LEXIS 57414, at *8 (D. Nev. Aug. 3, 2007) ("the majority of courts to address the issue have concluded that it is not necessary to join the primary violator in an action against a control person") (collecting cases).

Dated: November 10, 2025                                **SPONSEL MILLER PLLC**


                                                        */s/ Thane Tyler Sponsel III*
                                                        Thane Tyler Sponsel III
                                                        Texas Bar No. 24056361/Federal ID No. 690068
                                                        520 Post Oak Blvd., Suite 310
                                                        Houston, Texas 77027
                                                        Telephone: (713) 892-5400
                                                        Facsimile: (713) 892-5401
                                                        sponsel@smglawgroup.com

                                                        *Liaison Counsel for Lead Plaintiff and Liaison*
                                                        *Counsel the Class*


                                                        **LEVI & KORSINSKY, LLP**
                                                        Adam M.  Apton (*admitted pro hac vice*)
                                                        33 Whitehall Street, 27th Floor
                                                        New York, NY 10004
                                                        Tel.: (212) 363-7500
                                                        Fax: (212) 363-7171
                                                        Email: aapton@zlk.com

                                                        *Attorneys for Lead Plaintiffs and*
                                                        *Lead Counsel for the Class*

31

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of November 2025, I caused a true and correct copy of the foregoing to be filed with the Clerk of Court using the CM/ECF system which will send an electronic copy of the foregoing to counsel of record and constitutes service under Fed. R. Civ. P.5(b)(2)(E).

/s/ Thane Tyler Sponsel III
Thane Tyler Sponsel III

32