**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| IN RE DZS INC. SECURITIES LITIGATION<br><br>THIS DOCUMENT RELATES TO: ALL ACTION | §<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL NO. 4:23-CV-549-SDJ<br>MASTER DOCKET |

---

**PLAINTIFF'S MOTION FOR FINAL APPROVAL**
**OF CLASS ACTION SETTLEMENT**

---

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ..... 1

PRELIMINARY APPROVAL AND THE NOTICE PROGRAM ..... 3

ARGUMENT ..... 4

I. THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND WARRANTS FINAL APPROVAL ..... 4

A. Standards for Final Approval ..... 4

B. Approval of the Settlement Under Rule 23(e)(2) ..... 7

1. Plaintiff and Lead Counsel Have Adequately Represented the Settlement Class ..... 7

2. The Settlement Is the Product of Good Faith, Informed, and Arm's-Length Negotiations by Experienced Counsel ..... 8

3. The Settlement Provides Significant and Certain Benefits to the Settlement Class, Considering the Costs, Risks, and Delay of Litigation and Other Rule 23(e)(2) Factors... 9

4. The Effective Process for Distributing Relief ..... 12

5. The Settlement Does Not Excessively Compensate Plaintiff's Counsel ..... 13

6. Settlement Class Members Are Treated Equitably ..... 13

7. The Opinions of Plaintiff, Lead Counsel, and Settlement Class Members ..... 14

II. THE PLAN OF ALLOCATION SHOULD BE APPROVED ..... 15

III. NOTICE SATISFIED RULE 23, DUE PROCESS, AND THE PSLRA ..... 16

CONCLUSION ..... 17

**TABLE OF AUTHORITIES**

**Cases**

*In re 3D Sys. Sec. Litig.*,
No. 21-CV-1920 (NGG) (TAM), 2024 WL 50909 (E.D.N.Y. Jan. 4, 2024) .......................... 11

*Billitteri v. Sec. Am., Inc.*,
Nos. 3:09-cv-01568-F, et. al., 2011 WL 3586217 (N.D. Tex. Aug. 4, 2011) ........................ 5, 9

*In re Chicken Antitrust Litig. Am. Poultry*,
669 F.2d 228 (5th Cir. 1982) ........................................................................................ 15

*In re Chinese- Manufactured Drywall Prods. Liab. Litig.*,
424 F. Supp. 3d 456 (E.D. La. 2020)................................................................................ 8

*City of Providence v. Aeropostale, Inc.*,
No. 11 Civ. 7132(CM)(GWG), 2014 WL 18834944 (S.D.N.Y. May 9, 2014), aff'd sub nom. Arbuthnot v. Pierson, 607 F. App'x. 72 (2d Cir. 2015)........................................................ 14

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*,
4 F. Supp. 3d 94 (D.D.C. 2013)...................................................................................... 11

*In re HealthSouth Corp. Sec. Litig.*,
572 F.3d 854 (11th Cir. 2009) ........................................................................................ 5

*Klein v. O'Neal, Inc.*,
705 F. Supp. 2d 632 (N.D. Tex. 2010) ............................................................................ 4, 9

*Kostka v. Dickey's Barbecue Rests., Inc.*,
Case Nos. 3:20-cv-03424-K, et. al., 2022 WL 16821685 (N.D. Tex. Oct. 14, 2022), *Rep. & Recommendation adopted*, 2022 WL 16821665 (N.D. Tex. Nov. 8, 2022).......................... 6, 9

*Marcus v. J.C. Penney Co.*,
No. 6:13-CV-736, 2017 WL 6590976 (E.D. Tex. Dec. 18, 2017) ................................ 8, 14, 15

*Morris v. Affinity Health Plan, Inc.*,
859 F. Supp. 2d 611 (S.D.N.Y. 2012) ............................................................................ 11

*Neely v. Intrusion Inc.*,
Civil Nos. 4:21-cv-307-sdj, et. al., 2022 WL 17736350 (E.D. Tex. Dec. 16, 2022)................. 9

*In re Oil Spill by Oil Rig Deepwater Horizon*,
295 F.R.D. 112 (E.D. La. 2013) .................................................................................... 14

*Reed v. Gen. Motors Corp.*,
703 F.2d 170 (5th Cir. 1983) .......... 6

*Shen v. Exela Techs., Inc.*,
Case No. 3:20-CV-0691-D, 2023 WL 8527091 (N.D. Tex. Dec. 7, 2023) .......... 17

*In re Waste Mgmt., Inc. Sec. Litig.*,
Master File Number H-99-2183, 2002 WL 35644013 (S.D. Tex. May 10, 2002) .......... 15

**Statutes**

15 U.S.C. § 78u-4 .......... 13, 16

**Rules**

Fed. R. Civ. P. 23 .......... 6, 7, 16

Lead Plaintiff Jason Hawke ("Lead Plaintiff") on behalf of himself and the proposed Settlement Class, will move this Court on September 25, 2026, at 10:00 a.m., for entry of an order, pursuant to Rule 23(e)(2) of the Federal Rules of Civil Procedure: (i) approving the proposed class action Settlement; (ii) certifying the proposed Settlement Class, for purposes of the Settlement only; (iii) approving the proposed Plan of Allocation for distributing the proceeds of the Settlement; and (iv) granting such other and further relief as the Court may deem fair and proper.[1]

The Motion is based on the incorporated Declaration of Adam M. Apton in Support of (I) Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, dated July 23, 2026 ("Apton Declaration" or "Apton Decl."), with annexed exhibits, filed herewith.

Pursuant to the Court's Preliminary Approval Order (ECF No. 140), any objections to the Settlement and/or the Plan of Allocation must be served and filed with the Court by August 28, 2026. A proposed Judgment, negotiated by the Parties, and a proposed order approving the Plan of Allocation will be submitted with Plaintiff's reply submission on September 11, 2026, after the deadlines for objecting or seeking exclusion from the Settlement Class have passed.

**PRELIMINARY STATEMENT**

Plaintiff respectfully submits this Motion, on behalf of the proposed Settlement Class, for final approval of the Settlement of the above-captioned class action (the "Action") in the amount of $2,900,000, in cash, pursuant to the terms of the Stipulation of Settlement. The Settlement will resolve all claims against defendant Charles Daniel Vogt and Misty Kawecki ("Defendants," and

[1] The terms of the Settlement are set forth in the Stipulation and Agreement of Settlement, dated February 25, 2026 (the "Settlement Agreement" or "Stipulation," ECF No. 59). Capitalized terms used herein are defined in the Settlement Agreement and have the same meanings as set forth therein. Unless otherwise noted, citations and internal quotations have been omitted.

together with Plaintiff, the "Parties" and each a "Party"). As described below and in the accompanying Apton Declaration,[2] the Settlement is a very favorable result for the Settlement Class. Had the Settlement not been reached, there were considerable barriers to a greater recovery, or any recovery at all, particularly in light of the very real possibility that the Court would credit the Settling Defendants' fraud by hindsight and negative causation arguments and, separately, the possibility that DZS would not be a financially sound source of a future recovery in connection with a litigated judgment. In choosing to settle at this time, Plaintiff and Lead Counsel took into consideration the substantial challenges associated with advancing the claims through summary judgment and trial, as well as the duration and complexity of the legal proceedings that remained ahead.

The decision to settle was informed by a well-developed understanding of the strengths and weaknesses of the claims. For example, Lead Counsel (i) conducted a thorough and wide-ranging investigation concerning the allegedly fraudulent misrepresentations made by Defendants, which included a review and analysis of publicly available information and interviews conducted with former employees; (ii) consulted with experts on market efficiency, loss causation, and damages; (iii) prepared and filed a detailed consolidated amended complaint ("Amended Complaint") (ECF No. 48); (iv) conducted legal research and otherwise prepared for Defendants' motion to dismiss; (v) prepared and filed a detailed opposition to Defendants' motion to dismiss (ECF No. 50); and (vi) engaged in extensive mediation efforts overseen by David Murphy, Esq.,

[2] The Apton Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*: the history of the Action; the nature of the claims asserted; the litigation efforts; the negotiations leading to the Settlement; and the risks and uncertainties of continued litigation, among other things. Citations to "¶" in this memorandum refer to paragraphs in the Apton Declaration.

which included the preparation of mediation briefs and a full-day mediation session.. *See* Apton Decl. Sections I, III.-IV.

Additionally, the Settlement has the Plaintiff's full support, which is noteworthy given his background as a sophisticated investment advisor that was actively involved throughout the litigation and diligently represented the Settlement Class. *See* Declaration of Jason Hawke ("Hawke Decl").

The proposed Plan of Allocation for the distribution of the proceeds of the Settlement, which was developed by Lead Counsel with the assistance of Plaintiff's damages expert, is a fair and reasonable method for distributing the Net Settlement Fund to eligible claimants and should also be approved by the Court.

Given the considerations and the factors addressed below, Plaintiff respectfully submits that: (i) the Settlement meets the standards for final approval under Rule 23(e)(2) and is a fair, reasonable, and adequate result for the Settlement Class; and (ii) the Plan of Allocation is a fair and reasonable method for allocating the Net Settlement Fund to Settlement Class Members who submit valid Claim Forms.

## **PRELIMINARY APPROVAL AND THE NOTICE PROGRAM**

On June 11, 2026, the Court entered an order preliminarily approving the proposed Settlement, preliminarily certifying the Settlement Class, and approving the forms and methods of providing notice to the Settlement Class (the "Preliminary Approval Order," ECF No. 64). Pursuant to and in compliance with the Preliminary Approval Order, the Court-appointed Claims Administrator, Angeion Group ("Angeion"), caused the Postcard Notice to be disseminated to potential Settlement Class Members and banks, brokers, and other nominees ("Nominees"). *See* Declaration of Brian Wilson ("Mailing Decl."). To date, approximately 5,000 potential Settlement

Class Members and nominees have been notified of the Settlement by either mailed Postcard Notice or emailed direct link to the Postcard Notice. *See* Mailing Decl. at ¶11. In addition, Angeion caused the Summary Notice to be transmitted over *PR Newswire* on July 7, 2026. *Id.* at ¶13.

The long-form Notice and Claim Form, Postcard Notice, Stipulation, and other Settlement related documents were posted on a webpage established by Angeion for purposes of the Settlement, https://www.dzsisecuritiessettlement.com/. *Id.* at ¶14. The webpage also provides important dates and deadlines in connection with the Settlement, and access to an online claim portal. *Id.*

The notices collectively describe, *inter alia*, the claims, the contentions of the Parties, the course of the litigation, the terms of the Settlement, the maximum attorneys' fees and expenses, the proposed Plan of Allocation, the right to object, and the right to seek exclusion from the Settlement Class. The notices also give the deadlines for objecting, seeking exclusion, and submitting claims, and advise potential Settlement Class Members of the scheduled Settlement Hearing before this Court. To date, the Settlement Class's reaction to the proposed Settlement has been very positive. While the deadline (August 28, 2026) for objecting or seeking exclusion has not yet passed, to date there have been no objections to any aspect of the Settlement and no requests for exclusion.

## ARGUMENT

### I. THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE, AND WARRANTS FINAL APPROVAL

#### A. Standards for Final Approval

It is well established that federal courts favor the settlement of class actions as a matter of public policy. *See Klein v. O'Neal, Inc.,* 705 F. Supp. 2d 632, 650 (N.D. Tex. 2010) ("The public interest favoring settlement is especially apparent in the class action context where claims are

complex and may involve a large number of parties, which otherwise could lead to years of protracted litigation and sky-rocketing expenses."); *see also In re HealthSouth Corp. Sec. Litig.*, 572 F.3d 854, 862 (11th Cir. 2009) ("Public policy strongly favors pretrial settlement of class action lawsuits."). This is particularly true in complex securities cases, where the costs, risks, and uncertainties of continued litigation are especially pronounced. *See Billitteri v. Sec. Am., Inc.*, Nos. 3:09-cv-01568-F, et. al., 2011 WL 3586217, at *10 (N.D. Tex. Aug. 4, 2011) ("[S]ecurities litigation on the whole is 'notoriously difficult and unpredictable.'").

Rule 23(e)(2) provides that a class action settlement may be approved if the Court determines that it is "fair, reasonable, and adequate" after considering whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

- (i) the costs, risks, and delay of trial and appeal;
- (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
- (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
- (iv) any agreement required to be identified under Rule 23(e)(3);[3] and

(D) the proposal treats class members equitably relative to each other.

[3] Rule 23(e)(2)(C)(iv) requires the disclosure of any agreement between the parties in connection with a proposed settlement. The only agreements between the Parties concerning the Settlement are the Stipulation and a Confidential Supplemental Agreement Regarding Requests for Exclusion, dated as of February 27, 2026 ("Supplemental Agreement"). *See* Stipulation §X.G, XII.F.

Fed. R. Civ. P. 23(e)(2). While Rule 23 was amended in December 2018, it has not changed the well-established standard for approving a proposed class settlement, *i.e.* evaluating whether it is fair, adequate, and reasonable.[4] In addition to the Rule 23 factors, courts in the Fifth Circuit may also consider the factors enumerated in *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983),[5] many of which overlap with the Rule 23(e) factors. *See Kostka v. Dickey's Barbecue Rests., Inc.*, Case Nos. 3:20-cv-03424-K, et. al., 2022 WL 16821685, at *10 (N.D. Tex. Oct. 14, 2022), *Rep. & Recommendation adopted*, 2022 WL 16821665 (N.D. Tex. Nov. 8, 2022) (the "Rule 23(e)(2) requirements ... overlap significantly with the *Reed* factors").

At the preliminary approval stage, this Court considered the Rule 23(e)(2) factors in assessing the Settlement, and found it to be "fair, reasonable, and adequate to the Class Members to warrant providing notice of the Settlement to Class Members and holding a Settlement Hearing." Preliminary Approval Order at ¶¶5-6. Nothing has changed to alter this finding, and the factors supporting the Court's determination to preliminarily approve the Settlement remain applicable. Accordingly, Plaintiff and Lead Counsel respectfully submit that the proposed Settlement is fair, reasonable, and adequate, and warrants final approval under the Rule 23(e)(2) factors and Fifth Circuit law.[6]

---

[4] The Advisory Committee Notes to the 2018 amendments to the Federal Rules of Civil Procedure indicate that the factors set forth in Rule 23(e)(2) are not intended to "displace" any factor previously adopted by a Court of Appeals, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e)(2) Advisory Committee Notes to 2018 Amendments.

[5] The Fifth Circuit's approval factors are: "(1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members." *Reed*, 703 F.2d at 172.

[6] The second prong of the preliminary approval process was to determine whether the proposed Settlement Class should be certified for settlement purposes. *See* Fed. R. Civ. P. 23(e)(1)(B)(ii). The Court provisionally certified the proposed Settlement Class pursuant to Fed. R. Civ. P. 23(a)

### B. Approval of the Settlement Under Rule 23(e)(2)

#### 1. Plaintiff and Lead Counsel Have Adequately Represented the Settlement Class

In determining whether to approve a class action settlement, courts consider whether "the class representative and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). That requirement is readily satisfied here. Lead Counsel and Plaintiff vigorously litigated the claims in the Action, and the Settlement was achieved only after diligent, arm's-length, and mediated negotiations between counsel with considerable knowledge and expertise in the field of federal securities law.

Plaintiff and Lead Counsel have a deep understanding of the facts of the case and merits of the claims. Prior to filing the consolidated Amended Complaint, Lead Counsel conducted an extensive investigation into the facts underlying the potential claims, which included the review and analysis of (i) documents filed publicly by the Company with the U.S. Securities and Exchange Commission ("SEC"); (ii) publicly available information, including press releases, news articles, and other public statements issued by or concerning the Company and the Defendants; (iii) research reports issued by financial analysts concerning DZS; and (iv) other publicly available documents. In addition, Lead Counsel supplemented its documentary investigation by interviewing numerous former DZS employees with firsthand knowledge of the Company's accounting practices, revenue recognition procedures, and internal controls, and by consulting with a damages expert connection with loss causation, damages, and accounting issues. *See generally* Apton Decl., Sections I, III–IV.

---

and (b)(3). *See* Preliminary Approval Order at ¶¶2-4. Nothing has occurred that would alter the propriety of that determination.

Plaintiff is a sophisticated investment advisor that played a key role in the litigation by, among other things, reviewing and monitoring the progress of the litigation and regularly conferring with Lead Counsel concerning litigation strategy and reviewing periodic updates and other correspondence from counsel, including pleadings, briefs, and court orders. *See generally* Hawke Decl. With an informed understanding, Plaintiff agreed to the Settlement.

Throughout this litigation, Plaintiff also benefitted from the advice of knowledgeable counsel well-versed in securities class actions. Lead Counsel is highly qualified and experienced and has a long and successful track record in such cases (*see* Apton Decl., Ex. B (firm resume)) and effectively litigated this Action against opposing counsel, Baker Botts LLP, a highly regarded law firm. ¶75. Accordingly, the Settlement Class has been, and remains, well represented. Furthermore, in assessing the fairness of a settlement, courts give considerable weight to the opinion of experienced and informed counsel. *See Marcus v. J.C. Penney Co.,* No. 6:13-CV-736, 2017 WL 6590976, at *3 (E.D. Tex. Dec. 18, 2017) ("Significant weight is given to the opinion of class counsel concerning whether the settlement is in the best interest of the class ....").

**2. The Settlement Is the Product of Good Faith, Informed, and Arm's-Length Negotiations by Experienced Counsel**

Rule 23(e)(2)(B) and the first *Reed* factor, the absence of fraud or collusion behind the settlement, support final approval because the Settlement was negotiated after an arm's-length mediation conducted with the assistance of an experienced mediator, David Murphy of Phillips ADR Enterprises (the "Mediator") following Lead Counsel's extensive investigation and after the Parties had fully briefed Defendants' pending motion to dismiss, which provided both sides with a thorough understanding of the strengths and weaknesses of their respective positions.. ¶¶18-36. *See In re Chinese- Manufactured Drywall Prods. Liab. Litig.*, 424 F. Supp. 3d 456, 486 (E.D. La. 2020) ("arms-length negotiations between sophisticated parties with the guidance of an

experienced, professional mediator" provides strong presumption of fairness); *Billitteri,* 2011 WL 3586217, at *10 (finding no fraud or collusion in settlement reached through arm's length negotiations before neutral mediator). Moreover, "[t]he Court may presume that no fraud or collusion occurred between counsel, in the absence of any evidence to the contrary." *Klein,* 705 F. Supp. 2d at 651.

#### 3. The Settlement Provides Significant and Certain Benefits to the Settlement Class, Considering the Costs, Risks, and Delay of Litigation and Other Rule 23(e)(2) Factors

Rule 23(e)(2)(C)(i) instructs courts to consider the adequacy of a proposed settlement in light of "the costs, risks, and delay of trial and appeal." "The first consideration—the costs risks, and delay of trial and appeal—also implicates four of the *Reed* factors: (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings; (4) plaintiffs' probability of success; (5) the range of possible recovery." *Kostka*, 2022 WL 16821685, at *11.

To determine whether a proposed settlement is fair, reasonable, and adequate, courts balance the continuing risks of litigation against the benefits to class members through settlement. Although Plaintiff and Lead Counsel believe the claims to be strong, they acknowledge that the Settling Defendants could advance several substantial arguments that could have reduced, or altogether eliminated, any recovery for investors. Indeed, it is well known that "[s]ecurities claims are particularly 'difficult to prove' because of the high bar for establishing falsity…." *Neely v. Intrusion Inc.,* Civil Nos. 4:21-cv-307-sdj, et. al., 2022 WL 17736350, at *4 (E.D. Tex. Dec. 16, 2022).

First, continued litigation presented substantial risks. Most immediately, Plaintiff faced Defendants' pending motion to dismiss, which challenged whether Plaintiff's Complaint adequately alleged scienter under the PSLRA's demanding pleading standards. More specifically,

Defendants contested the weight and reliability of the confidential witness allegations and maintained that the alleged accounting irregularities and other red flags, whether considered individually or collectively, did not support a strong inference that Defendants acted intentionally or with recklessness. Moreover, even if Plaintiff prevailed at the pleading stage, these same disputed issues would have remained significant obstacles at summary judgment and trial. Plaintiff also would have faced additional risks in establishing loss causation and damages. Proceeding with the litigation would therefore have required substantial fact and expert discovery and further contested motion practice, significantly increasing the time and expense of the litigation without any assurance of an eventual recovery. ¶¶37-40.

Second, Plaintiff had not yet moved for class certification and would have been required to obtain certification of a class of investors before proceeding on a class-wide basis. Plaintiff anticipated that Defendants would adamantly oppose certification, including by raising issues concerning market efficiency. Even if a class were certified, Defendants could seek to narrow the class and the corresponding recoverable damages or pursue appellate review of any certification decision, creating additional expense, delay, and uncertainty for the Settlement Class. ¶47.

Plaintiff consulted with an expert on damages who estimated class-wide statutory damages in light of the facts and circumstances presented in the case. Plaintiff's consulting damages expert estimated that maximum statutory damages were approximately $44.6 million, depending on the trading model and assumptions used. Plaintiff and Lead Counsel nevertheless recognized that substantial risks remained in establishing liability and scienter, as well as proving the amount of recoverable damages through expert testimony, motion practice, and trial. ¶¶37-48.

Accordingly, the Settlement recovers approximately 6.5% of estimated maximum damages, which is a favorable result. *See, e.g., In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, &*

*"ERISA" Litig.*, 4 F. Supp. 3d 94, 103 (D.D.C. 2013) (settlement value approximating "4-8% of the 'best case scenario' potential recovery" deemed reasonable); *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 621 (S.D.N.Y. 2012) ("It is well-settled that a cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair"); *In re 3D Sys. Sec. Litig.*, No. 21-CV-1920 (NGG) (TAM), 2024 WL 50909, at *12 (E.D.N.Y. Jan. 4, 2024) (settlement representing approximately 1% of maximum damages approved as reasonable). In fact, over the past ten years, the median percentage of recovery (based upon NERA-defined losses) in securities class actions with similar investor losses was 5.2% of investor losses. *See* Apton Decl., Ex. A (Edward Flores, Svetlana Starykh & Ivelina Velikova, *Recent Trends in Securities Class Action Litigation: 2025 Full-Year Review* (NERA Jan. 2026), at 29).

Lastly, even if Plaintiff was to convince a jury on liability and damages, there are considerable risks to recovering damages. DZS has since entered bankruptcy, which significantly limits the practical ability to obtain any meaningful recovery from the Company itself. Continuing to litigate would increase the risk that any available insurance proceeds are depleted through continued defense costs and potential competing claims, thereby reducing the pool of funds potentially available for settlement or recovery. In light of these realities, further litigation would introduce substantial uncertainty and delay without a commensurate likelihood of improving the Class's recovery. ¶¶37-48. Therefore, although the case was well-underway, further litigation would have been expensive and time-consuming for both sides. Absent the Settlement, achieving a recovery for the Settlement Class would have required overcoming the pending motion to dismiss, completing complex and expensive expert discovery, certifying a class, briefing anticipated motions for summary judgment, trial preparation and trial, post-trial motions, and

inevitable appeals on a host of issues. The fact that the Settlement eliminates these delays, expense, and risks favors final approval.

#### 4. The Effective Process for Distributing Relief

The Settlement, like most securities class action settlements, will be effectuated with the assistance of an established and experienced claims administrator, Angeion. The Claims Administrator will employ a well-tested protocol for the processing of claims in a securities class action. Specifically, a Claimant will submit, either by mail or online using the settlement webpage, the Court-approved Claim Form. Based on trading information provided by Claimants, the Claims Administrator will determine each Claimant's eligibility to recover by, among other things, calculating their respective "Recognized Claims" based on the Court-approved Plan of Allocation,[7] and ultimately will determine each eligible Claimant's *pro rata* portion of the Net Settlement Fund. Plaintiff's claims will be reviewed in the same manner. Claimants will be notified of any defects or conditions of ineligibility and be given the chance to contest the rejection of their claims. Stipulation, Exhibit A. Any claim disputes that cannot be resolved will be presented to the Court. *Id.*

After the Settlement reaches its Effective Date (*id.* at §I.G) and the claims process is completed, Authorized Claimants will be issued payments. If there are unclaimed funds after the initial distribution, and it would be feasible and economical to conduct a further distribution, the Claims Administrator will conduct a further distribution of remaining funds (less the estimated expenses for the additional distribution, Taxes, and unpaid Notice and Administration Expenses). Additional distributions will proceed in the same manner until it is no longer economical to conduct further distributions. Thereafter, Plaintiff recommends that any de minimis balance that

---

[7] Approval of the Plan of Allocation is discussed in Section II., below.

remains in the Net Settlement Fund, after payment of any outstanding Notice and Administration Expenses, will be contributed to a 501(c)(3) non-profit organization(s) unaffiliated with the Parties or their counsel, and approved by the Court.[8]

**5. The Settlement Does Not Excessively Compensate Plaintiff's Counsel**

As discussed in Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, filed herewith, the requested fee award of 33% of the Settlement Fund would be reasonable in light of, among other things, counsel's efforts, the result obtained for the Settlement Class, and the risks and complexity of the litigation. The Court's approval of attorneys' fees is distinct from its approval of the Settlement, and neither Plaintiff nor Lead Counsel may cancel or terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees and/or Litigation Expenses.

**6. Settlement Class Members Are Treated Equitably**

The Settlement does not improperly grant preferential treatment to Plaintiff or any segment of the Settlement Class. Rather, all members of the Settlement Class, including Plaintiff, will receive a pro rata distribution from the Net Settlement Fund pursuant to the plan of allocation approved by the Court.[9] Moreover, Lead Counsel developed the proposed Plan of Allocation, discussed below, with the assistance of Plaintiff's damages expert and it is consistent with the Settlement Class's theories of damages under the Securities Act and the Exchange Act. ¶¶55-61.

---

[9] Although Lead Plaintiff Hawke is seeking reimbursement of its reasonable costs and expenses (including lost wages) directly related to its participation in the Action, pursuant to the PSLRA, this would not constitute preferential treatment. *See* 15 U.S.C. § 78u-4(a)(4) (reimbursement of a plaintiff's costs and expenses is explicitly contemplated, in addition to receiving a *pro rata* portion of the recovery).

**7. The Opinions of Plaintiff, Lead Counsel, and Settlement Class Members**

Lead Counsel, Plaintiff, and Settlement Class Members all support final approval of the Settlement, thereby satisfying the sixth *Reed* factor. Lead Counsel conducted a thorough investigation into the claims against Defendants and, after more than three years of hard-fought litigation and settlement negotiations, have a firm understanding of the strengths and risks attendant to these claims. *See generally* Apton Decl., Sections I, III–V. Based on this understanding, as well as their substantial experience of litigating complex securities class actions, Lead Counsel has concluded that the Settlement is fair, reasonable, and adequate. *See Marcus,* 2017 WL 6590976, at *3 ("Significant weight is given to the opinion of class counsel concerning whether the settlement is in the best interest of the class ...."); *In re Oil Spill by Oil Rig Deepwater Horizon,* 295 F.R.D. 112, 150 (E.D. La. 2013) ("In evaluating a settlement, the Court should rely on counsel who know the strengths and weaknesses of their cases.").

Likewise, Plaintiff, a sophisticated investment advisor with a financial stake in the outcome of the Litigation, also endorses the Settlement. *See* Hawke Decl. at ¶¶4, 6. Plaintiff actively supervised Lead Counsel during the litigation and was kept apprised of the settlement negotiations with the Settling Defendants, as well as developments in the underlying litigation. Plaintiff's support for the Settlement further demonstrates their fairness. *See City of Providence v. Aeropostale, Inc.,* No. 11 Civ. 7132(CM)(GWG), 2014 WL 1883494, at *4 (S.D.N.Y. May 9, 2014) ("[T]he recommendation of Lead Plaintiff, a sophisticated institutional investor, also supports the fairness of the Settlement."), *aff'd sub nom. Arbuthnot v. Pierson,* 607 F. App'x. 72 (2d Cir. 2015).

Finally, the overwhelmingly positive response of the Settlement Class to date also supports final approval. To date, there have been no objections to the Settlement nor any requests for exclusion.[10]

## II. THE PLAN OF ALLOCATION SHOULD BE APPROVED

A plan for allocating settlement proceeds under Rule 23 is evaluated under the same standard as the settlement—the plan must be "fair, adequate, and reasonable." *In re Chicken Antitrust Litig. Am. Poultry,* 669 F.2d 228, 238 (5th Cir. 1982). A plan of allocation need not be perfect to be fair, reasonable, and adequate; "[a] just allocation necessitates that the class members who lost the most should stand to gain the most from a settlement." *See Marcus,* 2017 WL 6590976, at *5; *see also In re Waste Mgmt., Inc. Sec. Litig.,* Master File Number H-99-2183, 2002 WL 35644013, at *20 (S.D. Tex. May 10, 2002) (approving plan where class received proceeds "based on the size and strength of their claims"), amending judgment on other grounds, 2003 WL 27380802 (S.D. Tex. July 31, 2003).

Here, the proposed Plan of Allocation was developed by Lead Counsel in consultation with Plaintiff's causation and damages expert. The Plan creates a framework for the equitable distribution of the Net Settlement Fund among Settlement Class Members who suffered economic losses as a result of Defendants' alleged violations of the federal securities laws, as opposed to economic losses caused by market or industry factors or unrelated Company-specific factors. ¶56.

Claims asserted in the Action under Section 10(b) of the Exchange Act serve as the basis for the calculation of the "Recognized Loss Amounts" in the Plan. Pursuant to Section 10(b), for losses to be compensable, the disclosure of the allegedly misrepresented information must be the

[10] Plaintiff will address any objections or exclusions received after the filing of this motion in their September 11, 2026 reply.

cause of the decline in the price of the securities at issue. This formula calculates losses based on corrective information released on March 10, 2023, June 1, 2023, and November 9, 2023, which impacted the market price of DZS common stock as the market absorbed the disclosures and allegedly removed artificial inflation from DZS's stock price. ¶¶55-59. Accordingly, in order to have a Section 10(b) loss in the Settlement, shares of DZS must have been purchased or otherwise acquired between May 4, 2022 to November 9, 2023, both dates inclusive (the "Class Period") and held through at least one of these corrective disclosure dates. *Id.*

Authorized Claimants will recover their proportional "*pro rata*" amount of the Net Settlement Fund based on their calculated total recognized loss. *See Celeste,* 2022 WL 17736350, at *5 (approving plan of allocation in which each class member would receive a pro rata share of recognized loss). The Plan of Allocation was fully disclosed in the Notice and, to date, there have been no objections to the Plan. ¶¶55-59. For these reasons, the Plan should be approved.

## III. NOTICE SATISFIED RULE 23, DUE PROCESS, AND THE PSLRA

Notice of a class action settlement must be directed "in a reasonable manner to all class members who would be bound" by the Settlement. Fed. R. Civ. P. 23(e)(1)(B). In granting preliminary approval of the Settlement, the Court approved Plaintiff's proposed notice plan. Preliminary Approval Order at ¶¶8-16. The content of the notices here provided the necessary information for Settlement Class Members to make an informed decision and all of the information required by Rule 23(c)(2)(B) and the PSLRA. 15 U.S.C. § 78u-4(a)(7).

The notice program's combination of individually mailed Postcard Notices to all Settlement Class Members who could be identified with reasonable effort, supplemented by transmission over a business newswire, and publication on an internet website satisfied all requirements of Rule 23, due process, and the PSLRA. Comparable notice programs have been

routinely approved. *See, e.g., Shen v. Exela Techs., Inc.,* Case No. 3:20-CV-0691-D, 2023 WL 8527091, at *2 (N.D. Tex. Dec. 7, 2023) ("The Court finds that the dissemination of the Postcard Notice, the online posting of the Notice, and the publication of the Summary Notice ... satisfied" Rule 23, due process, and the PSLRA).

As of July 23, 2026, a total of approximately 5,000 potential Settlement Class Members and nominees were notified of the Settlement by either mailed Postcard Notice or emailed direct link to the Postcard Notice. *See* Mailing Decl. at ¶¶11. In addition, Angeion caused the Summary Notice to be issued and transmitted over *PR Newswire. Id.* at ¶13. Additional information, as well as access to copies of the Notice and Claim Form, Postcard Notice, Stipulation, and Preliminary Approval Order, are also available on the Settlement webpage: https://www.dzsisecuritiessettlement.com/. *Id.* at ¶14.

The notice program provided the best notice practicable under the circumstances here and satisfied Rule 23, due process, and the PSLRA.

**CONCLUSION**

For the reasons set forth herein and in the Apton Declaration, Plaintiff respectfully requests that the Court grant final approval of the Settlement, approve the Plan of Allocation for the distribution of the proceeds of the Settlement, and certify the Settlement Class for purposes of the Settlement only. Proposed orders will be submitted with Plaintiff's reply papers, after the deadline for objecting and seeking exclusion from the Settlement Class has passed.

Dated: July 23, 2026

Respectfully submitted,

**SPONSEL MILLER PLLC**

*/s/ Thane Tyler Sponsel III*
Thane Tyler Sponsel III
Texas Bar No. 24056361/Federal ID No. 690068
520 Post Oak Blvd., Suite 310
Houston, Texas 77027
Telephone: (713) 892-5400
Facsimile: (713) 892-5401
sponsel@smglawgroup.com

*Liaison Counsel for Lead Plaintiff and Liaison Counsel the Class*

**LEVI & KORSINSKY, LLP**
Adam M. Apton (admitted *pro hac vice*)
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Lead Counsel for Lead Plaintiff and Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 23, 2026, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system and all counsel of record will receive an electronic copy via the Court's CM/ECF system. I certify under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 23, 2026

*/s/ Thane Tyler Sponsel III*
Thane Tyler Sponsel III

**CERTIFICATE OF CONFERENCE**

I hereby certify that counsel has complied with the meet and confer requirement in Local Rule CV-7(h). Plaintiff provided Defendants with a copy of the motion prior to filing. Defendants subsequently confirmed that they consent to the relief sought in the motion and do not oppose it.

Dated: July 23, 2026

*/s/ Thane Tyler Sponsel III*
Thane Tyler Sponsel III